UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


JOSEPH NGOUNE DJOUMESSI,

               Petitioner,

v.                               CASE NO. 05-CV-70455-DT
                                  HONORABLE ARTHUR J. TARNOW

HUGH WOLFENBARGER,

               Respondent.
_____/

## OPINION AND ORDER DENYING
## PETITION FOR WRIT OF HABEAS CORPUS

     Petitioner Joseph Ngoune Djoumessi has filed a *pro se* application for the writ of habeas

corpus under 28 U.S.C. § 2254. The habeas petition challenges Petitioner's state convictions for

criminal sexual conduct and child abuse. Because Petitioner's claims do not warrant the grant of

a new trial, the habeas petition is denied.

### I. Background

     Petitioner was charged in Oakland County, Michigan with conspiracy to commit

kidnapping, kidnapping, two counts of first-degree criminal sexual conduct, one count of third-

degree criminal sexual conduct, and two counts of third-degree child abuse. He was tried jointly

with his wife, Evelyn Djoumessi, who was charged with conspiracy to commit kidnapping,

kidnapping, and two counts of third-degree child abuse. On September 7, 2001, the jury found

Petitioner guilty of one count of third-degree criminal sexual conduct, MICH. COMP. LAWS §

750.520d(1)(a), and one count of third-degree child abuse, MICH. COMP. LAWS § 750.136b(4).[1]

He was acquitted of all the other counts. The convictions arose from allegations that Petitioner

beat and raped a teenager who lived with, and worked for, him and his family. The trial court

sentenced Petitioner to imprisonment for nine to fifteen years for criminal sexual conduct and to

a concurrent term of one year for child abuse.

Petitioner raised four of his eight habeas claims through counsel in an appeal of right. He

raised the remaining four habeas claims in a *pro se* brief. The Michigan Court of Appeals

remanded the case for an evidentiary hearing on juror misconduct. The trial court conducted an

evidentiary hearing and concluded that Petitioner failed to carry his burden of proving juror

misconduct.

The Michigan Court of Appeals subsequently addressed the four appellate claims raised

through counsel and affirmed Petitioner's convictions and sentence in an unpublished *per curiam*

decision. *See People v. Djoumessi*, No. 238631 (Mich. Ct. App. Oct. 28, 2003). Petitioner

raised all eight habeas claims in the Michigan Supreme Court, which denied leave to appeal on

July 29, 2004. *See People v. Djoumessi*, 471 Mich. 866; 683 N.W.2d 672 (2004) (table).

Petitioner filed his habeas corpus petition on February 4, 2005. The grounds for relief

read:

> I.      Petitioner is entitled to a new trial where it was not revealed until
>         after verdict that one of the jurors had been a victim of sexual
>         assault and domestic violence and used those experiences to
>         influence the verdict.

---

[1] Co-defendant Evelyn Djoumessi was convicted of one count of third-degree child abuse.

II. The trial court committed reversible error in rejecting defense counsel's request that the court instruct the jury on how to consider testimony regarding an agreement that star state witness Patrick Che would receive a benefit for cooperation in the prosecution of the petitioner.

III. Petitioner was denied a fair trial and an impartial jury where the trial court, despite a defense objection, refused to give the jury, which had indicated it could not reach a verdict, the standard hung jury instruction, and instead gave them an instruction that was both unduly coercive and substantially departed from the approved standard instruction.

IV. There was insufficient evidence to support Petitioner's conviction for criminal sexual conduct, 3rd degree.

V. The prosecutor engaged in misconduct by shifting the burden of proof onto Petitioner thus denying him a fair trial.

VI. The prosecutor's many acts of misconduct denied Petitioner a fair trial.

VII. Petitioner's due process right to sentencing based upon accurate information was violated when the trial court permitted the scoring of the guidelines to be based strictly on information gathered prior to trial, which resulted in the exclusion of all other information in the scoring of offense variables.

VIII. That part of the judgment of sentence ordering restitution of the cost of extradition is not authorized by law and should be vacated.

Respondent urges the Court to deny the habeas petition.

## II.  Standard of Review

Section 2254(d) of Title 28, United States Code, imposes the following standard of

review for habeas cases:

> An application for a writ of habeas corpus on behalf of a person in custody
> pursuant to the judgment of a State court shall not be granted with respect to any
> claim that was adjudicated on the merits in State court proceedings unless the
> adjudication of the claim –
>
> (1)  resulted in a decision that was contrary to, or involved an
>      unreasonable application of, clearly established Federal law, as
>      determined by the Supreme Court of the United States; or
>
> (2)  resulted in a decision that was based on an unreasonable
>      determination of the facts in light of the evidence presented in the
>      State court proceedings.

28 U.S.C. § 2254(d).  Additionally, this Court must presume the correctness of state court factual

determinations.  28 U.S.C. § 2254(e)(1).

A decision of a state court is "contrary to" clearly established federal law if the state

court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law

or if the state court decides a case differently than the Supreme Court has on a set of materially

indistinguishable facts.  *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000).  An "unreasonable

application occurs" when "a state-court decision unreasonably applies the law of [the Supreme

Court] to the facts of a prisoner's case."  *Id*. at 409.  A federal habeas court may not "issue the

writ simply because that court concludes in its independent judgment that the relevant state-court

decision applied clearly established federal law erroneously or incorrectly.  Rather, that

application must also be unreasonable." *Id.* at 411. When no state court adjudicated the merits

of a claim, the deference due under 28 U.S.C. § 2254(d) does not apply, and habeas review is *de*

*novo*. *Higgins v. Renico*, 470 F.3d 624, 630 (6th Cir. 2006) (quoting *Maples v. Stegall*, 340 F.3d

433, 436 (6th Cir. 2003) and citing *Wiggins v. Smith*, 539 U.S. 510, 534 (2003)).

### III. Discussion

### A. Juror Misconduct

Petitioner alleges that he is entitled to a new trial because one of the jurors who

deliberated his case did not disclose during *voir dire* that she had been a victim of sexual assault

and domestic violence. According to Petitioner, the juror also tried to influence the other

deliberating jurors on the basis of her own personal experience.

### 1. The Sixth Amendment and *McDonough*

The Sixth Amendment to the United States Constitution

> guarantees a criminal defendant a trial by an impartial jury. *Morgan v. Illinois*,
> 504 U.S. 719, 726-27 (1992). "In essence, the right to jury trial guarantees to the
> criminally accused a fair trial by a panel of impartial, 'indifferent' jurors." *Irvin*
> *v. Dowd*, 366 U.S. 717, 722 (1961). The presence of even a single biased juror
> deprives a defendant of his right to an impartial jury. *See Morgan*, 504 U.S. at
> 729.

*Williams v. Bagley*, 380 F.3d 932, 943-34 (6th Cir. 2004), *cert. denied*, 544 U.S. 1003 (2005).

*Voir dire* protects the right to an impartial jury "by exposing possible biases, both known and

unknown, on the part of potential jurors." *McDonough Power Equipment, Inc. v. Greenwood*,

464 U.S. 548, 554 (1984). Thus, it is necessary for prospective jurors to provide truthful

answers.  *Id.*  To be entitled to a new trial, Petitioner "must first demonstrate that a juror failed to answer honestly a material question on *voir dire*, and then further show that a correct response would have provided a valid basis for a challenge for cause."  *Id.* at 556.

Juror 5 explained at the post-conviction evidentiary hearing in state court that she and her first husband had an altercation about twenty years earlier and that they "may have" pushed each other and he may have hit her.  She viewed the incident as a disagreement.  She stated that her husband had wanted sexual intercourse, but she did not, although she ultimately consented to having sex.  She claimed that there was no violence in connection with the sexual activity and that she did not leave her ex-husband because of the incident.

Although Juror 5 was one of the first venire persons to be seated in the jury box during *voir dire*, she did not respond when the prospective jurors were asked whether anyone had been a victim of a crime or of sexual assault.  (Tr. Aug. 10, 2001, at 49 and 62).  She volunteered information about her job, because she thought the attorneys should know that she was a civil rights paralegal, but she did not state that she had been a victim of an assault or domestic violence.  However, she testified at the post-conviction hearing that she did not consider herself a victim of an assault or domestic violence.  Therefore, even assuming that Juror 5's altercation with her former husband involved criminal conduct, Petitioner has failed to demonstrate that Juror 5 did not honestly answer a material question on *voir dire*.  Petitioner has not satisfied the McDonough test.

## 2. Actual Bias

*McDonough* "is not the exclusive test for determining whether a new trial is warranted: a showing that juror was actually biased, regardless of whether the juror was truthful or deceitful, can also entitle a defendant to a new trial." *Jones v. Cooper*, 311 F.3d 306, 310 (4th Cir. 2002). In other words, "*McDonough* does not entirely foreclose a party from seeking a new trial on the basis of a prospective juror's honest, though mistaken, response." *Zerka v. Green*, 49 F.3d 1181, 1186 n.7 (6th Cir. 1995) (citing *Amirault v. Fair*, 968 F.2d 1404, 1405-06 (1st Cir. 1992)). However, "[i]n the absence of intentional concealment, only extreme circumstances justify a new trial," and the petitioner must prove "actual juror bias." *Id.*

Jurors are presumed to be impartial. *See Irvin v. Dowd*, 366 U.S. 717, 723 (1961). "[D]ue process does not require a new trial every time a juror has been placed in a potentially compromising situation. . . . Due process means a jury capable and willing to decide the case solely on the evidence before it . . . ." *Smith v. Phillips*, 455 U.S. 209, 217 (1982). A juror must be able to "lay aside his [or her] impression or opinion and render a verdict based on the evidence presented in court." *Irvin v. Dowd*, 366 U.S. at 723.

A biased juror, in the usual sense, "is one who has a predisposition against or in favor of the defendant. In a more limited sense, a biased juror is one who cannot 'conscientiously apply the law and find the facts.'" *Franklin v. Anderson*, 434 F.3d 412, 422 (6th Cir. 2006) (quoting *Wainwright v. Witt*, 469 U.S. 412, 423 (1985)). "If an impaneled juror was actually biased, the conviction must be set aside." *Hughes v. United States,* 258 F.3d 453, 463 (6th Cir. 2001).

Juror 5 testified at the evidentiary hearing that she did not leave her ex-husband because of the altercation with him. She also testified that it had not been a violent marriage, that she remained on very good terms with her ex-husband, and that she had no preconceived notions about victimization or assault based on her own experiences. She considered herself to be a fair and honest person whom she would want on the jury.

Three other jurors who deliberated Petitioner's case testified that Juror 5 had revealed during deliberations that her former husband or boyfriend sexually assaulted or raped her. Although Juror 5 admitted at the evidentiary hearing that she may have embellished her comments during deliberations, the trial court concluded that Petitioner had failed to carry his burden of proving that Juror 5 was unqualified to sit as a fair and impartial juror. The trial court also stated that the testimony at the evidentiary hearing did not reveal any grounds to excuse Juror 5 for cause. The Michigan Court of Appeals agreed on the basis of the record that Juror 5 was not excusable for cause and that Petitioner was not prejudiced by Juror 5's presence on the jury.

"The question of whether a trial court has seated a fair and impartial jury is a factual one, involving an assessment of credibility." *Gall v. Parker*, 231 F.3d 265, 308 (6th Cir. 2000) (citing *Patton v. Yount*, 467 U.S. 1025, 1038 (1984)), *overruled on other grounds by Bowling v. Parker*, 344 F.3d 487, 501 n.3 (6th Cir. 2003). Therefore, the trial court's determination that Juror 5 was a fair and impartial juror is entitled to a presumption of correctness unless Petitioner can rebut the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Mason v. Mitchell*, 320 F.3d 604, 614 (6th Cir. 2003).

The fact that Juror 5 did not view herself as a victim of a crime, an assault, or domestic violence is an indication that she was not predisposed to find Petitioner guilty. Her discussion of the incident with her ex-husband arose when some jurors expressed disbelief at the complainant's inability to remember certain dates and times and her failure to tell more people about Petitioner's conduct toward her. She claimed at the evidentiary hearing that she used her personal experience to explain why a victim might have trouble remembering dates and times and why a victim might not reveal abuse.

It is also significant that Juror 5 considered herself to be a fair juror. A court may rely on a juror's "assurances of impartiality in deciding whether a defendant has satisfied his burden of proving actual prejudice." *Hughes v. United States*, 258 F.3d at 459-60 (citing *United States v. Pennell*, 737 F.2d 521, 533 (6th Cir. 1984)).

The Court concludes from the record that Juror 5 could not have been excused for cause solely on the basis of her altercation with her former husband some twenty years earlier. Unlike the situation in *Burton v. Johnson*, 948 F.2d 1150, 1159 (10th Cir. 1991), Juror 5 did not suffer mental and physical abuse over a long period of time, and she was not still living in an abusive situation. Juror 5 demonstrated an ability to decide Petitioner's case solely on the evidence presented at trial.

### 3. Internal and External Influences

Petitioner alleges that Juror 5's revelation of her ex-husband's abusive treatment was an improper and extraneous influence on the jury's verdict. The Michigan Court of Appeals

determined on review of this claim that Petitioner had failed to demonstrate that the jury's

verdict was improperly influenced by an extraneous influence.

The "firmly-established common-law rule in the United States flatly prohibit[s] the

admission of juror testimony to impeach a jury verdict." *Tanner v. United States*, 483 U.S. 107,

116 (1987). "Exceptions to the common-law rule [are] recognized only in situations in which an

'extraneous influence,' *Mattox v. United States*, 146 U.S. 140, 149 (1892), [is] alleged to have

affected the jury." *Id.*

The United States Court of Appeals for the Sixth Circuit "has defined 'an extraneous

influence on a juror [as] one derived from specific knowledge about or a relationship with either

the parties or their witnesses.'" *Garcia v. Andrews*, __ F.3d __, __, No. 05-3856, 2007 WL

1437430, at *6 (6th Cir. May 17, 2007) (quoting *United States v. Herndon*, 156 F.3d 629, 635

(6th Cir. 1998)). "Examples of extraneous influence include 'prior business dealings with the

defendant, applying to work for the local district attorney, conducting an out of court

experiment, and discussing the trial with an employee.'" *Id.* (quoting *United States v. Owens*,

426 F.3d 800, 805 (6th Cir. 2005)).

Other examples of extrinsic influences are "an attempt to bribe a juror . . . and newspaper

articles and media attention." *Williams v. Bagley*, 380 F.3d at 945 (citing *United States v.

Herndon*, 156 F.3d at 635). Still other extrinsic influences are "(1) statements made to the jury

by a bailiff, *Parker v. Gladden*, 385 U.S. 363 (1966); (2) a juror's contact with a party during

trial, *Washington Gas Light Co. v. Connolly*, 214 F.2d 254 (D.C. Cir. 1954); and (3) a juror's

contact with someone who suggested that the juror could profit by bringing in a verdict for the

defendant.  *Remmer v. United States*, 347 U.S. 227 (1954)).”    *United States v. Gonzales*, 227 F.3d 520, 524 (6th Cir. 2000).

“Examples of ‘internal’ influences . . . include the behavior of jurors during deliberations, the jurors’ ability to hear and comprehend trial testimony, and the physical and mental incompetence of a juror.” *Williams v. Bagley*, 380 F.3d at 945 n.7.  Internal factors, including whether a juror was pressured into arriving at a particular conclusion, may not be used to challenge a final verdict.  *Doan v. Brigano*, 237 F.3d 722, 733 (6th Cir. 2001) (citing *Tanner*, 483 U.S. at 117-21), *abrogated on other grounds by Wiggins v. Smith*, 539 U.S. 510 (2003).

At issue here was Juror 5’s behavior and subjective feelings during deliberations.   Juror 5’s revelation about her ex-husband’s conduct was an internal influence on the jury’s verdict. *Williams v. Bagley*, 380 F.3d at 945 n.7.  In fact, one of the jurors who testified at the evidentiary hearing stated that, in her opinion, Juror 5 did not listen objectively during deliberations. Another juror testified at the hearing that Juror 5’s story did not have a direct impact on her decision-making.  The third juror testified that he believed the prosecution proved some things, but not other things.

It is clear from the record that the jurors compromised their verdicts in order to reach a unanimous decision.  The three jurors who testified at the evidentiary hearing apparently voted to convict Petitioner on two counts in return for an acquittal on the kidnapping, conspiracy, and other counts.  The fact that all the jurors voted to acquit Petitioner of the most serious charges against him indicates the absence of an extraneous influence and the lack of a due process violation. *See Garcia v. Andrews*, 2007 WL 14374, at *6 (noting that the jurors’ vote to convict

11

the petitioner, despite a juror's subjective fear of reprisal from the defendants' family, indicated the lack of a due process violation).

### 4. Sham Hearing

Petitioner alleges that the state evidentiary hearing was a sham because the trial court refused to consider evidence that Juror 5 failed to disclose information that the United States Attorney, for whom she worked, was involved in the case and had already made a decision. The trial court, however, determined that the hearing was limited to the issues found in the juror's affidavits and Petitioner's motion to remand.

Petitioner nevertheless alleges that the trial court reached an impermissible racist conclusion that the three African American jurors who testified at the evidentiary hearing were disgruntled and incredible jurors. "[O]pinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible." *Liteky v. United States,* 510 U.S. 540, 555 (1994). Nothing in the record supports the view that the trial court was racist or antagonistic toward Petitioner.

Moreover, there is some support in the record for the trial court's conclusion that the three jurors who testified at the evidentiary hearing were disgruntled. The three of them stated in their affidavits that they capitulated to Juror 5 and her supporters due to the length of the deliberations and the continuing deadlock. One of the three jurors testified that the vote was

sometimes eight to four, although the four people who held a different opinion were not always the same people.

According to the investigator who interviewed the three "disgruntled" jurors, one of them said that she and the other two jurors who testified at the hearing held one view and the remaining jurors sided with Juror 5. The same juror also informed the investigator that it would not be beneficial to speak with the jurors who sided with Juror 5. The investigator concluded that the three jurors whom he interviewed had capitulated to the majority view and given Juror 5 and her supporters a guilty verdict on the criminal sexual conduct charge in return for a "not guilty" verdict on the kidnapping charge.

The trial court's findings were not clearly erroneous or an unreasonable determination of the facts, and "[w]here there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Anderson v. City of Bessemer*, 470 U.S. 564, 574 (1985). The Court concludes that the state evidentiary hearing was not a sham. Furthermore, an "attack on [a] state court's application of post-conviction procedures does not state a basis for federal habeas relief." *Lawrie v. Snyder*, 9 F. Supp.2d 428, 449 (D. Del. 1998).

### 5. Conclusion on Juror Misconduct Claim

The state appellate court's rejection of Petitioner's juror-misconduct claim did not result in a decision that was contrary to, or an unreasonable application of, Supreme Court precedent. Nor was the state court's determination of the facts unreasonable. Therefore, Petitioner has no right to relief on the basis of his first claim.

highlights

**B. The Jury Instructions**

**1. Witness Cooperation**

The complainant testified that she informed Patrick Che about Petitioner's abusive conduct. Che testified that he confronted Petitioner with the information and that Petitioner admitted to having sex with the complainant, but promised to make amends and not to let it happen again. Che did not inform the police of Petitioner's conduct even though he was a school teacher and was required by law to report suspected child abuse, and the prosecution agreed not to charge Che for failing to report suspected child abuse.

In light of Che's immunity from prosecution, Petitioner asked the trial court to read a modified version of CJI2d 5.13.[2] He wanted the trial court to explain that the jury should weigh Che's credibility in light of the fact that Che received a benefit in exchange for testifying. Petitioner alleges in his habeas petition that the trial court committed reversible error when it denied his request. The Michigan Court of Appeals adjudicated this claim and held that the issue did not warrant reversal.

---

[2]  At the time, CJI2d 5.13 read as follows:

(1) You have heard testimony that a witness, [name witness ], made an agreement with the prosecutor about charges against [him / her] in exchange for [his / her] testimony in this trial. You have also heard evidence that [ name witness ] faced a possible penalty of [ state maximum possible penalty ] as a result of those charges.

(2) You are to consider this evidence only as it relates to [ name witness ]'s credibility and as it may tend to show [ name witness ]'s bias or self-interest.

*Djoumessi*, Mich. Ct. App. No. 238631, at 8, n.29.

The question on habeas review of jury instructions is not whether the instructions were "undesirable, erroneous, or even 'universally condemned,'" but whether the ailing instructions "so infected the entire trial that the resulting conviction violates due process." *Cupp v. Naughten*, 414 U.S. 141, 146-47 (1973). "An omission, or an incomplete instruction, is less likely to be prejudicial than a misstatement of the law," *Henderson v. Kibbe*, 431 U.S. 145, 155 (1977), and "the fact that the instruction was allegedly incorrect under state law is not a basis for habeas relief," *Estelle v. McGuire*, 502 U.S. 62, 71-72 (1991).

The lack of a specific jury instruction on the agreement not to prosecute Patrick Che did not deprive Petitioner of due process, because the prosecutor explained the immunity agreement to the jury during her opening statement. (Tr. Aug. 13, 2001, at 83.) The prosecutor also elicited testimony concerning the terms of the agreement and the fact that Che initially lied under oath during the investigatory stage of the case. (Tr. Aug. 20, 2001, at 81-85.) The attorneys questioned Che about his need for immunity, his motive for testifying, his failure to report the sexual abuse, his status as a resident alien and whether his testimony affected that status, and the fact that he was not immune from federal prosecution. (*Id.* at 175-87, 217-18, and 227-28.)

Furthermore, as the Michigan Court of Appeals recognized:

> "[t]he trial court's general instructions on witness credibility were sufficient to adequately guide the jury in assessing the credibility of Che's testimony. For example, the jurors were instructed that it was their job to assess witness credibility, and in doing so, they should consider if the witness has any bias, prejudice, or personal interest in the case, if there have been any promises, threats, or other influences that may have affected how the witness testified, and if the witness had any special reason to be untruthful.

*Djoumessi*, Mich. Ct. App. No. 238631, at 8.[3]

The Michigan Court of Appeals concluded that the general instructions on witness credibility were sufficient to adequately guide the jury in assessing the credibility of Che's testimony. This Court agrees. The proposed instruction was "substantially covered by the charge actually delivered to the jury," *United States v. Franklin*, 415 F.3d 537, 553 (6th Cir. 2005) (quoting *United States v. Williams*, 952 F.2d 1504, 1512 (6th Cir. 1991)), which fully apprised the jurors of the relevant considerations and how to evaluate Che's credibility. Therefore, the state court's decision was not contrary to, or an unreasonable application of *Cupp v. Naughten*, *Henderson v. Kibbe*, or *Estelle v. McGuire*.

---

[3] The actual instruction on the credibility of witnesses included the following language:

[I]t is your job to decide what the facts of the case are. You must decide which witnesses you believe and how important you think their testimony is. You do not have to accept or reject everything a witness said. You are free to believe all, none, or part of any person's testimony.

. . . .

Does the witness have any bias, prejudice, or personal interest in how this case is decided. Have there been any promises, threats, suggestions, or other influences that affected how the witness testified? In general, does the witness have any special reasons to tell the truth or any special reason to lie? All in all how reasonable does the witness' testimony seem when you think about all the other evidence in the case?

(Tr. Aug. 30, 2001, at 10-11.)

## 2. Deadlocked-Jury Instruction

Petitioner alleges that he was denied a fair trial and an impartial jury because the trial court refused to give the standard deadlocked-jury instruction when the jurors announced that they could not reach a verdict. Petitioner states that the actual instruction read to the jury was unduly coercive and a substantial departure from the standard instruction. The Michigan Court of Appeals adjudicated this claim on the merits and concluded that the trial court's instructions were not a substantial departure from the standard deadlocked jury instruction and were not coercive.

In *Allen v. United States*, 164 U.S. 492 (1896), the Supreme Court approved a jury instruction which stated that

> in a large proportion of cases absolute certainty could not be expected; that, although the verdict must be the verdict of each individual juror, and not a mere acquiescence in the conclusion of his fellows, yet they should examine the question submitted with candor, and with a proper regard and deference to the opinions of each other; that it was their duty to decide the case if they could conscientiously do so; that they should listen, with a disposition to be convinced, to each other's arguments; that, if much the larger number were for conviction, a dissenting juror should consider whether his doubt was a reasonable one which made no impression upon the minds of so many men, equally honest, equally intelligent with himself. If, on the other hand, the majority were for acquittal, the minority ought to ask themselves whether they might not reasonably doubt the correctness of a judgment which was not concurred in by the majority.

*Id.* at 501.

When Petitioner's jury announced that it could not reach a verdict, the trial court read the following instruction:

THE COURT: You have returned from deliberations indicating that you believe you cannot reach a verdict. Please keep in mind, as stated previously on the record, there are 11 independent verdicts to be deliberated. I'm going to ask you to please return to the jury room and resume your deliberations in the hope that after further discussion you will be able to reach a verdict on each of the 11.

As you deliberate please keep in mind the guidelines that I have given you earlier. Remember it is your duty to consult with your other jurors and try to reach agreement if you can do so without violating your own judgment. To return a verdict you must all agree, and the verdict must represent the judgment of each of you.

As you deliberate you should carefully and seriously consider the views of your fellow jurors. Talk things over in a spirit of fairness and frankness. Naturally there will be differences of opinion. You should each not only express your opinion but also give the facts and the reasons on which you base it. By reasoning the matter out jurors can often reach agreement.

When you continue your deliberations, do not hesitate to rethink your own views and change your opinion if you decide it was wrong. However, none of you should give up your honest belief about the weight or effect of the evidence only because of what your fellow jurors think or only for the sake of reaching agreement.

(Tr. Sept. 6, 2001, at 3-4.) These instructions were similar to the standard Michigan jury

instruction on deadlocked juries. *See* CJI2d 3.12. The trial court went on to say:

Now we have reached the noon hour. This instruction that I have just given you will also be given to you in the jury room. You will be recessing for lunch and I ask that you return, it's a quarter to one now so I ask that you return at a quarter to two, you need at least an hour, in the jury room.

Now I know some of you have some additional questions and I know that there's someone [sic], what's going on on Saturday. So be mindful that the Court is aware of all your concerns but this is the final instruction that I'm giving you. Have patience. Do your job and everything will work out fine.

So again I tell you to go into the jury room, deliberate this matter and bring back a true and just verdict on each of the 11 independent verdicts to be deliberated by you. That's is [sic].

(Tr. Sept. 6, 2001, at 4-5.)

Petitioner alleges that these supplemental instructions were unduly coercive and urged verdict compromise. He maintains that the supplemental instructions could have caused at least one juror to give up his or her beliefs and defer to the majority's view for the sake of rendering a verdict.

The supplemental comments could be viewed as coercive because they directed the jury to reach a verdict and they advised the jury not to expect any additional instructions. The implication was that the jury was required to reach a verdict. However, immediately before making these comments, the trial court stated that the jurors should not give up their honest beliefs about the evidence in order to reach an agreement or because of the opinion of the other jurors. Had the trial court omitted this aspect of an *Allen* instruction, the Court would be more inclined to find that the supplemental jury instructions were coercive.

The instructions as a whole were not coercive. Even if the Court were to conclude "that there was jury coercion here, it is at least reasonable to conclude that there was not, which means that the state court's determination to that effect must stand." *Early v. Packer*, 537 U.S. 3, 11 (2002).

### C. Sufficiency of the Evidence

Petitioner contends that there was insufficient evidence to support his conviction for third-degree criminal sexual conduct. According to him, there was no evidence that force or coercion was used to accomplish penetration and the complainant's testimony failed to support the prosecution's theory of nonconsensual sex. Review of this claim is *de novo* because no state court adjudicated the claim on the merits. *Higgins v. Renico*, 470 F.3d at 630.

### 1. Legal Framework

"[T]he Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970). After *Winship,* the critical question on review of the sufficiency of the evidence to support a criminal conviction is

> whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt. [T]his inquiry does not require a court to 'ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt.' Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

*Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979) (internal citation and footnote omitted) (emphasis in original). This "standard must be applied with explicit reference to the substantive elements of the criminal offense as defined by state law," *id.* at 324 n.16, and through the framework of 28 U.S.C. § 2254(d), *Martin v. Mitchell*, 280 F.3d 594, 617 (6th Cir. 2002).

The incident which formed the basis for the third-degree criminal sexual conduct charge occurred in December of 1998, when the complainant was 16 years of age. To prove this charge,

the prosecutor had to prove that Petitioner sexually penetrated the complainant and that force or coercion was used to accomplish the sexual penetration. Mich. Comp. Laws § 750.520d(1)(b). The "force or coercion" element "includes but is not limited to any of the circumstances listed in [Mich. Comp. Laws] section 520b(1)(f)(i) to (v)." *Id.* Section 520b(1)(f)(iii) states that "force or coercion" includes "coerc[ing] the victim to submit by threatening to retaliate in the future against the victim, or any other person, and the victim believes that the actor has the ability to execute this threat." As stated in *People v. Carlson*, 466 Mich. 130, 140; 644 N.W.2d 704, 709 (2002), "the prohibited 'force' encompasses the use of force against a victim to either induce the victim to submit to sexual penetration or to seize control of the victim in a manner to facilitate the accomplishment of sexual penetration without regard to the victim's wishes."

## 2. The Facts

The Michigan Court of Appeals summarized the relevant evidence as follows:

> The victim alleged that, after moving in with Djoumessi, she was denied the opportunity to attend school, beaten with a belt, and sexually assaulted. The victim maintained that she was threatened with being returned to Africa if she told anyone about the alleged mistreatment.
>
> . . . .
>
> The victim testified that, beginning in 1998, Djoumessi sexually assaulted her approximately five times. She testified that, during the summer of 1998, when she was fifteen years old, Djoumessi came home at approximately 3:00 a.m., and directed her to come into his room. The victim indicated that . . . Evelyn Djoumessi was at work. According to the victim, after going into the room, Djoumessi went into the bathroom and came out naked. Djoumessi directed her to take off her clothes, which she did, and Djoumessi then felt her breasts, kissed her, and penetrated her vagina with his penis. Djoumessi next directed her to perform fellatio on him, which she did, and he ejaculated. The victim testified that she believed that she "had to do what [Djoumessi] said," and that Djoumessi threatened to send her back to Africa if she told anyone about the acts.

21

The following morning, while she was in the bathroom and Evelyn Djoumessi was still at work, Djoumessi asked the victim to go into the basement for the purpose of repeating the sexual acts. Djoumessi came downstairs, touched her breasts, and penetrated her vagina with his penis. Djoumessi then warned her that if she told anyone, she would go to jail because she was in the United States under a bogus name, or be sent back to Africa. The victim testified that, on other occasions, Evelyn Djoumessi had also threatened to send her back to Africa.

The victim testified that, a few days later, she told Patrick Che, a Cameroon native and Evelyn Djoumessi's cousin with whom she had developed a friendship, what had occurred. At trial, Che corroborated the victim's claim that she called him, and indicated that she was crying and upset during their conversation. Che testified that, on the following morning, he called Djoumessi and asked him to come to his house. Che testified that, after Djoumessi arrived, he went outside because his fiancée was home and spoke to Djoumessi in his car. Che indicated that, after advising Djoumessi of the victim's allegations, he initially acted surprised but then admitted that he had sex with the victim. According to Che, Djoumessi said that he was drunk and that it would not happen again, and asked Che not to report him to the authorities.

The victim testified that, in December 1998, when she was sixteen years old, Djoumessi again sexually assaulted her. She indicated that, at the time Djoumessi's family was in California. According to the victim, as she was sitting on a couch, Djoumessi sat next to her and, when she tried to get up, he told her to sit on his lap. Djoumessi then told her to remove her shorts and put on a nightgown. After she went into the basement, Djoumessi came into the basement carrying a condom. Djoumessi then took off his pants and her underwear, put on the condom, and penetrated her vagina with his penis. After approximately five minutes, Djoumessi stopped and went upstairs. The victim testified that she again told Che about the assault. Che testified that he told the victim to shout and call the police if Djoumessi attempted to assault her again.

. . . .

At trial, Djoumessi denied any wrongdoing. He admitted that the victim did not attend school, and that he "smacked" the victim with his hand on one occasion. He denied that the victim was brought to the United States to care for his children, and denied that he ever sexually assaulted the victim, beat her with a belt, or threatened to send her back to Africa. He also denied ever having a conversation with Che, or admitting any wrongdoing to him. Djoumessi maintained that he treated the victim like a daughter and only wanted to provide her with a better life.

*Djoumessi*, Mich. Ct. App. No. 238631, at 1-3.

### 3. Application

As noted, the conviction in question arose from the December 1998 incident. The complainant's testimony about that incident satisfied the element of penetration. She stated that Petitioner penetrated her vagina with his penis. (Tr. Aug. 14, 2001, at 191-95) The fact that there was no physical evidence to support the complainant's testimony is of no moment, because "[c]ircumstantial evidence is sufficient to sustain a conviction." *United States v. Bender*, 265 F.3d 464, 472 (6th Cir. 2001) (quoting *United States v. Abiles*, 167 F.3d 1021, 1032 (6th Cir. 1999)).

As for the element of force or coercion, the complainant testified that she was crying when Petitioner inserted his penis in her vagina. (Tr. Aug. 14, 2001, at 195). She claimed that Petitioner had said he and his wife would separate if the complainant informed his wife about the incident, and the separation would hurt their children. (*Id.* at 197-98). The complainant also stated that she informed Patrick Che about the December 1998 incident in the hope that Patrick would speak to Petitioner and do something about it. (*Id.* at 198-99.) On cross-examination by Petitioner's attorney, she testified that Petitioner once told her he could whatever he wanted and that he had her life in his hands. (Tr. Aug. 16, 2001, at 89-90.) On cross-examination by Evelyn Djoumessi's attorney, the complainant testified that she did not make up her accusations. (Tr. Aug. 17, 2001, at 86.)

Viewed in a light most favorable to the prosecution, a rational trier of fact could have concluded from the evidence that the complainant did not consent to Petitioner's sexual

penetration of her in December of 1998 and that Petitioner induced the complainant to submit to sexual penetration by threatening to retaliate against her in the future. Although Petitioner denied sexually penetrating the complainant, a federal habeas court is not required to assess the credibility of witnesses on review of sufficiency-of-the-evidence claims. *Matthews v. Abramajtys*, 319 F.3d 780, 788 (6th Cir. 2003). "On collateral review . . . , the court must defer to a jury's credibility determinations and resolutions of conflicts in testimony, weight accorded to evidence, and reasonable inferences drawn from the basic facts to reach ultimate factual conclusions." *Caldwell v. Russell*, 181 F.3d 731, 738 n.6 (6th Cir. 1999), *abrogated on other grounds by Mackey v. Dutton*, 217 F.3d 399 (6th Cir. 2000).

The Court concludes that the prosecutor proved the elements of third-degree criminal sexual conduct beyond a reasonable doubt and that the evidence was sufficient to support Petitioner's conviction. "[I]t was not irrational for the jury to accept the prosecutor's evidence as establishing guilt beyond a reasonable doubt." *Tinsley v. Million*, 399 F.3d 796, 815 (6th Cir.), *cert. denied*, __ U.S. __, 126 S. Ct. 760 (2005).

### D. The Prosecutor

The fifth and sixth habeas claims allege prosecutorial misconduct. Review of these claims is *de novo* because no state court adjudicated the claims on their merits. *Higgins v. Renico*, 470 F.3d at 630.

To prevail on a claim of prosecutorial misconduct, a petitioner must demonstrate that the prosecutor's conduct violated a specific constitutional right or was sufficiently prejudicial and infected the trial with such unfairness as to make the resulting conviction a denial of due process.

*Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974).  It is not enough to show that the

prosecutor's conduct or remarks were undesirable or even universally condemned.  *Darden v.*

*Wainwright*, 477 U.S. 168, 181 (1986).  "On habeas review, the standard to be applied to claims

of prosecutorial misconduct is whether the conduct was 'so egregious as to render the entire trial

fundamentally unfair.'"  *Pritchett v. Pitcher*, 117 F.3d 959, 964 (6th Cir. 1997) (quoting *Cook v.*

*Bordenkircher*, 602 F.2d 117, 119 (6th Cir. 1979)).

Courts must ask first whether the prosecutor's conduct or remarks were improper.  *Slagle*

*v. Bagley,* 457 F.3d 501, 516 (6th Cir. 2006), *cert. denied*, __ S. Ct. __, 2007 WL 1172856 (U.S.

June 18, 2007).  If they were improper, the court must consider the following factors to

determine whether the improper acts were so flagrant as to warrant reversal:

> (1) whether the evidence against the defendant was strong, (2) whether the
> conduct of the prosecution tended to mislead the jury or prejudice the defendant;
> (3) whether the conduct or remarks were isolated or extensive; and (4) whether
> the remarks were made deliberately or accidentally.

*Id.*

### 1. Shifting the Burden of Proof

Petitioner alleges that the prosecutor shifted the burden of proof to him on cross-

examination and during closing arguments.  The prosecutor questioned Petitioner whether he had

asked "Brian," who lived with Petitioner periodically during the time in question, to help him out

at trial.  (Tr. Aug. 24, 2001, at 213-14).  Although the trial court sustained defense counsel's

objection to the question, the prosecutor made the following remarks during her rebuttal

argument:

I would point out that we heard from all the people who were in and out of the Doumessi household, all of the Cameroonian people and relatives with the exception of Brian. He's the only non-family member . . . . Where is Brian? Slept there for three years, they don't know his last name. They were able to find Justin Fru in the Cameroons but they can't find Brian, they don't even know his last name. Well guess what? Brian saw or heard something that they don't want you to know about.

(Tr. Aug. 29, 2001, at 123).

Prosecutors may not "suggest that the defendant had the burden of proof or any obligation to produce evidence to prove his innocence." *United States v. Clark*, 982 F.2d 965, 968-69 (6th Cir. 1993). Prosecutors also may not misrepresent evidence, *Hodge v. Hurley*, 426 F.3d 368, 380 (6th Cir. 2005), nor assert facts that were never admitted in evidence, *Washington v. Hofbauer,* 228 F.3d 689, 700 (6th Cir. 2000).

The comments block-quoted above were improper because there was no evidence that "Brian" saw or heard something that the defendants did not want the jurors to know. The suggestion that Petitioner should have produced "Brian" as a witness also may have been ill-advised. However, the impropriety was not so flagrant that it requires a new trial. *Cf. Greer v. Mitchell*, 264 F.3d 663, 683 (6th Cir. 2001) (stating that, "[w]hile the prosecutor's remark concerning petitioner's lack of an expert to refute the coroner's testimony may have been ill-advised, one cannot say that the impropriety was so flagrant that it require[s] reversal because only a new trial could correct the error'"). Even though the remarks were deliberately placed before the jury, they were a minor part of a lengthy trial. They could not have misled the jury, and the evidence against Petitioner was strong.

Furthermore, the prosecutor apparently intended to rebut Petitioner's argument that the crimes did not and could not have happened because the entire household was at home then. (Tr. Aug. 29, 2001, at 42-44.) Prosecutors ordinarily are "entitled to wide latitude in rebuttal argument and may fairly respond to arguments made by defense counsel." *Angel v. Overberg*, 682 F.2d 605, 607-08 (6th Cir. 1982) (*en banc*).

### 2. Other prosecutorial conduct

Petitioner alleges that the prosecutor committed many other acts of misconduct and that the cumulative effect of these errors deprived him of a fair trial.

### a. Personal Belief

Petitioner alleges that the prosecutor stated a personal belief in the Petitioner's guilt when she asked Detective Sandra Rochford whether the complainant discussed any sexual history "prior to being raped by the defendant." Petitioner objected to the prosecutor's conclusory remark that he had raped the complainant. The prosecutor then said,

> That's what I'm alleging. . . . I don't need to use the word alleged. I don't believe that it's alleged, I believe that it happened -- that I charged it. . . . . I'm allowed to call it a rape. It is a rape. That's what we've charged.

(Tr. Aug. 21, 2001, at 92.)

Prosecutors may not "express a personal opinion or belief regarding the truth or falsity of any testimony or evidence." *United States v. Hurst*, 951 F.2d 1490, 1502 (6th Cir. 1991) (citing *United States v. Young*, 470 U.S. 1, 8 (1985)). However, the jury could not have been misled by the remark, because the prosecutor made it clear that rape was the charge, and the trial court stated, "It's alleged."

### b. Closing Arguments

During closing arguments, the prosecutor stated to the jurors that they did not hear what the complainant told Leslie Milton (Patrick Che's girlfriend) because that was inadmissible hearsay. The prosecutor then said that, after trial, they could talk about what the complainant told Ms. Milton. (Tr. Aug. 29, 2001, at 111.)

The prosecutor also stated that the complainant was bought and paid for, that the defense witnesses deserved a "D" for honesty, and that the "code of silence" employed by the family and friends of the defendants hindered the pretrial investigation of the case. (*Id.* at 116, 121-22.) Finally, she stated that the jurors had taken an oath to convict. (*Id.* at 126.)

The comment about Leslie Milton insinuated that the prosecutor had special knowledge of facts not known to the jury and that information not in evidence would have supported the complainant's testimony. Vouching for witnesses by indicating a personal belief in the witness's credibility or by placing the prestige of the prosecutor's office behind that witness is improper. *United States v. Francis*, 170 F.3d 546, 550 (6th Cir. 1999).

It also was improper to say that the jurors had taken an oath to convict. However, it is difficult to believe that the prosecutor intended to say this, because the jurors swore to "justly decide the questions" and to "render a true verdict only on the evidence introduced and in keeping with the trial court's instructions." (Tr. Aug. 13, 2001, at 48.) Moreover, it is clear from the post-conviction evidentiary hearing that the jurors did not believe they were obligated to convict Petitioner on the basis of the oath they took.

Implying that the defense witnesses lied during their testimony also was questionable conduct. Prosecutors ordinarily "may not express a personal opinion concerning the guilt of the defendant or the credibility of trial witnesses, because such personal assurances of guilt or vouching for the veracity of witnesses by the state's representative exceeds the legitimate advocate's role by improperly inviting the jurors to convict the defendant on a basis other than a neutral independent assessment of the record proof." *Caldwell v. Russell*, 181 F.3d at 737. However, Petitioner's testimony contradicted that of the complainant, and when there is conflicting testimony, as there was here, "it may be reasonable to infer, and accordingly to argue, that one of the two sides is lying." *United States v. Collins,* 78 F.3d 1021, 1040 (6th Cir. 1996); *see also United States v. Francis*, 170 F.3d 546, 551 (6th Cir. 1999) ("[A] prosecutor may assert that a defendant is lying during her closing argument when emphasizing discrepancies between the evidence and that defendant's testimony."); *United States v. Veal*, 23 F.3d 985, 989 (6th Cir. 1994) (stating that, where the defendant put his veracity at issue by taking the stand, it was not improper for the prosecutor to argue that the defendant should not be believed because he had a motive to lie).

Even if the prosecutor's remarks were improper, the evidence against Petitioner was substantial in that Patrick Che corroborated the complainant's testimony. Furthermore, prosecutors are entitled to "argue the record, highlight the inconsistencies or inadequacies of the defense, and forcefully assert reasonable inferences from the evidence." *Bates v. Bell*, 402 F.3d 635, 646 (6th Cir.), *cert. denied*, __ U.S. __, 126 S. Ct. 163 (2005). They may point out the lack of evidence supporting the defense theory, *United States v. Forrest*, 402 F.3d 678, 686 (6th Cir.

2005), and they may comment on the lack of exculpatory evidence so long as the comment is such that the jury would not interpret it as a comment on the defendant's failure to testify. *United States v. Tarwater*, 308 F.3d 494, 511 (6th Cir. 2002). "They may even "argue that the jury should arrive at a particular conclusion based on the record evidence, including the conclusion that the evidence proves the defendant's guilt." *Caldwell v. Russell*, 181 F.3d at 737.

The Court concludes that, while some of the prosecutor's remarks were improper, they were not flagrant. Thus, none of Petitioner's individual or cumulative claims about the prosecutor warrant habeas relief.

### E. The Sentence

Petitioner's final two claims challenge his sentence.

### 1. The Sentencing Guidelines

Petitioner alleges that the trial incorrectly scored the state sentencing guidelines by assessing points for three offense variables and by failing to consider evidence adduced at trial. The alleged violation of state law and the allegedly improper interpretation of the State's sentencing guidelines fail to state claims on which habeas relief may be granted. *Austin v. Jackson*, 213 F.3d 298, 300 (6th Cir. 2000) (citing *Pulley v. Harris*, 465 U.S. 37, 41 (1984)); *Whitfield v. Martin*, 157 F. Supp. 2d 758, 762 (E.D. Mich. 2001). Federal courts may grant the writ of habeas corpus only on the ground that the petitioner is "in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The following discussion illustrates that Petitioner's sentence did not violate federal law.

### a. Offense Variable 12

Petitioner asserts that he was scored fifty points for criminal sexual penetrations for which he was acquitted. This claim has no merit, because a sentencing court may consider a wide range of factors in determining the applicable guideline range, including "conduct of which a defendant has been acquitted." *United States v. Watts*, 519 U.S. 148, 154 (1997). This principle remains true even though *Watts* was decided before the Supreme Court held in *United States v. Booker*, 543 U.S. 220 (2005), and *Booker's* predecessors that a court may not "sentence a defendant above an offense's statutory maximum by finding facts not authorized by the jury's verdict." *United States v. Brika*, __ F.3d __, __, No. 05-4537, 2007 WL 1483718, at *8 (6th Cir. May 23, 2007).

Furthermore, there was evidence to support the claims for which Petitioner was acquitted. The complainant testified that Petitioner sexually assaulted her about five times, and Patrick Che testified that Petitioner admitted to having sexual intercourse with the complainant.

### b. Offense Variable 13

Petitioner alleges next that he was incorrectly assessed five points under offense variable 13 for psychological injury to the victim. The complainant, however, informed the presentence investigator that the injuries she sustained as a result of the sexual assaults were psychological injuries, which she could not forget. *See* Mich. Dep't of Corrections Presentence Investigation, Victim Impact Statement. At sentencing, the prosecutor stated that the complainant had been in counseling ever since the events in question happened, (Tr. Sept. 20, 2001, at 14), and the complainant's foster mother testified that the complainant had appeared depressed and attended

weekly therapy sessions while living in foster care. (*Id.* at 33-34.) This information supports the conclusion that the complainant was affected psychologically by Petitioner's conduct.

### c. Offense Variable 25

Finally, Petitioner alleges that he was assessed fifteen points under offense variable 25 for contemporaneous criminal acts even though he was convicted of two criminal acts and acquitted of the other five counts. To the extent that Petitioner is making the same argument that he made for offense variable 12, his claim lacks merit.

Petitioner argued through counsel at the sentencing that there were no "contemporaneous criminal acts," as defined by state law, to justify the score of fifteen points. (*Id.* at 9-10.) The prosecutor argued in response that Petitioner committed other contemporaneous crimes by beating the complainant, fondling the complainant's breasts during the December 1998 incident, and by not sending the complainant to school. (*Id.* at 14.) Even assuming that offense variable 25 was incorrectly scored at fifteen points instead of zero, a correct scoring of offense variable 25 would not have made a difference in the overall sentencing guidelines score. *See Djoumessi*, Mich. Ct. App. No. 238631, at 13-14.

### d. Conclusion on Sentencing Guidelines Claim

Petitioner's state law claims are not cognizable on habeas review, and he has not shown that the trial court sentenced him on the basis of "misinformation of constitutional magnitude," *Roberts v. United States*, 445 U.S. 552, 556 (1980) (quoting *United States v. Tucker*, 404 U.S. 443, 447 (1972)), or on "extensively and materially false" information, which he had no

opportunity to correct. *Townsend v. Burke*, 334 U.S. 736, 741 (1948). Therefore, he has no right to relief from the sentence imposed.

## 2. *Blakely*

Petitioner asserts that his sentence was enhanced on the basis of facts and information not decided by the jury, in violation of *Blakely v. Washington*, 542 U.S. 296 (2004). The Supreme "Court has repeatedly held that, under the Sixth Amendment, any fact that exposes a defendant to a greater potential sentence must be found by a jury, not a judge, and established beyond a reasonable doubt, not merely by a preponderance of the evidence." *Cunningham v. California*, __ U.S. __, __, 127 S. Ct. 856, 863-64 (2007). Stated differently, "the Federal Constitution's jury-trial guarantee proscribes a sentencing scheme that allows a judge to impose a sentence above the statutory maximum based on a fact, other than a prior conviction, not found by a jury or admitted by the defendant." *Id*. at 860. "[T]he relevant 'statutory maximum' is not the maximum sentence a judge may impose after finding additional facts, but the maximum he may impose *without* any additional findings." *Blakely*, 542 U.S. at 303-04. (emphasis in original).

A majority of the Supreme Court indicated that *Blakely* applies only to determinate sentencing systems. *See Blakely*, 542 U.S. at 308-09. This is made clear in *Cunningham*, where the Supreme Court explained that states may retain determinate sentencing by requiring the jury "to find any fact necessary to the imposition of an elevated sentence" or by permitting judges "'to exercise broad discretion . . . within a statutory range,' which 'everyone agrees,' encounters

no Sixth Amendment shoal." *Cunningham,* 127 S. Ct. at 871 (quoting *United States v. Booker*, 543 U.S. 220, 233 (2005)).[4]

Michigan has an indeterminate sentencing system in which the minimum sentence generally is based on sentencing guidelines and the maximum sentence is set by law, not by the trial court. *People v. Claypool*, 470 Mich. 715, 730 n.14; 684 N.W.2d 278, 286 n.14 (2004). "[B]ecause a Michigan defendant is always subject to serving the maximum sentence provided for in the statute that he or she was found to have violated, that maximum sentence constitutes the 'statutory maximum' as set forth in *Blakely*." *People v. Drohan*, 475 Mich. 140, 163-64; 715 N.W.2d 778, 791 (2006).

Petitioner's maximum sentence of fifteen years fell within the statutory maximum of not more than fifteen years in prison, *see* Mich. Comp. Laws 750.520d(2), and "[a] sentencing court does not violate *Blakely* and its progeny by engaging in judicial fact-finding to score the [offense variables] to calculate the minimum recommended sentencing guidelines range . . . ." *Uphaus*,

---

[4] The Supreme Court held in *Cunningham* that California's determinate sentence law, which placed sentence-elevating factfinding within the judge's province, violated the Sixth Amendment right to trial by jury. The Michigan Court of Appeals recently noted that

> [t]he system at issue in *Cunningham* is distinguishable from Michigan's sentencing scheme. [T]he maximum sentence under Michigan's sentencing scheme is the maximum sentence provided under the statute that defines the offense . . . . Thus, the maximum sentence provided in the statute proscribing the offense is the maximum sentence authorized by the jury's verdict unless and until another statutory provision applies.

*People v. Uphaus*, __ N.W.2d __, __, No. 267238, 2007 WL 987012, at ¶ 20 (Mich. Ct. App. Apr. 3, 2007).

2007 WL 987012, at ¶ 17. Therefore, Petitioner's sentence is not affected by, and did not implicate, *Blakely*.

### 3. Restitution

Petitioner alleges that there was no statutory authority to support the trial court's order to pay restitution for the cost of his extradition from California to Michigan. He asserts that the police and prosecution knew where he was and could have asked him to appear in court. He further alleges that the cost of extradition did not arise directly from the commission of any crime.

This claim lacks merit because the writ of habeas corpus may be granted only if the Petitioner "is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). A fine is not a sufficient restraint on liberty to meet the "in custody" requirement of this statute, particularly when, as here, the prisoner's release was not conditioned on paying the fine. *See United States v. Watroba*, 56 F.3d 28, 28 -29 & 29 n.1 (6th Cir. 1995) (interpreting 28 U.S.C. § 2255). Because Petitioner's restitution claim does not seek release from custody, his argument lacks merit. *Taylor v. Hamlet*, 88 Fed. Appx. 220 (9th Cir. 2004) (unpublished opinion interpreting 28 U.S.C. § 2255 and citing *United States v. Kramer*, 195 F.3d 1129, 1130 (9th Cir. 1999)); *see also Lara v. Smith*, 132 Fed. Appx. 420, 421, 2005 WL 1274627, at *1 (3rd Cir. 2005) (unpublished opinion interpreting 28 U.S.C. § 2241).

## IV.  Conclusion

The state appellate court's decision on claims I - III and VII was not contrary to, or an

unreasonable application of, Supreme Court precedent.  The remaining claims lack

merit.  Accordingly, the habeas petition is DENIED.


s/Arthur J. Tarnow
Arthur J. Tarnow
United States District Judge

Dated:  July 12, 2007


I hereby certify that a copy of the foregoing document was served upon counsel of record on July 12, 2007, by
electronic and/or ordinary mail.

s/Catherine A. Pickles
Judicial Secretary